Paul REID and Mary J. Reid,
Plaintiffs, Appellants,

v.

KEY BANK OF SOUTHERN MAINE,
INC., Defendant, Appellee.

Paul REID and Mary J. Reid,
Plaintiffs, Appellees,

v.

KEY BANK OF SOUTHERN MAINE,
INC., Defendant, Appellant.

Nos. 86–1820, 86–1864.

United States Court of Appeals,
First Circuit.

Argued March 2, 1987.
Decided June 10, 1987.

John S. Campbell with whom Richard E. Poulos and Daniel G. Lilley, Portland, Me., were on brief, for plaintiffs, appellants.

Jules L. Mogul with whom Edward W. Gould and Gross, Minsky, Mogul & Singal, Bangor, Me., were on brief, for defendant, appellee.

Before CAMPBELL, Chief Judge, BOWNES and SELYA, Circuit Judges.

BOWNES, Circuit Judge.

Plaintiffs Paul and Mary J. Reid brought a seventeen-count action in United States District Court for the District of Maine against Key Bank of Southern Maine, Inc., defendant. Plaintiffs alleged various federal and state claims resulting from the actions of Depositors Trust Co. of Southern Maine (Depositors), Key Bank's predecessor in interest. The suit grew out of the circumstances surrounding the termination

by Depositors of plaintiffs' credit arrangement with it. A jury trial resulted in a verdict for plaintiffs on one of the counts and an award of damages. Both parties have appealed.

## I. SUMMARY OF THE FACTS

In mid–1975, Paul Reid approached Depositors to obtain financing for the establishment of a painting business. From 1976 through 1979, Depositors granted Reid a series of loans which Reid used for the operation of his business, Pro Paint and Decorating. During this period, Peter H. Traill was the loan officer responsible for Reid's accounts, Marco F. DeSalle was the president of the bank, and Henry Lawson was, for a time, an assistant vice-president.

On March 2, 1979, Reid and Depositors entered into a $25,000 commercial credit agreement. The agreement was variously explained at trial as a "line of credit" and an "incomplete loan." However defined, it was the largest amount of credit Depositors had yet extended to Reid. Reid sought the credit primarily to finance work he was performing at the Bucksport Housing Project for Nickerson & O'Day, Inc., a general contractor.

In mid-May, 1979, Traill telephoned Reid and informed him that Depositors would not grant him any further advances under the March agreement. Reid had thought at the time that this halt of further advances might only be temporary. Defendant claimed that Traill sent Reid a follow-up letter on May 18, 1979, stating that Depositors would no longer honor overdrafts on Reid's accounts and suggesting that Reid restructure his debts with another lender. Reid denied receiving the letter and alleged that it was never, in fact, sent to him.

On May 29, 1979, Nickerson & O'Day sent a check to Depositors as payment for Reid's work at the Bucksport Housing Project. The check was for $6,507.90. It was made out to Depositors and to Pro Paint pursuant to an agreement between Depositors and Reid whereby Reid assigned his accounts receivable to Depositors as security for the March loan. De-

positors credited $2,500 to the account of Pro Paint and applied the remaining $4,007.90 to offset part of the outstanding balance on Reid's March loan. Reid claimed that Depositors undertook this action without his authorization.

Reid claimed that another check was also inappropriately handled by Depositors. He testified that on June 8, 1979, he gave Traill a check for an amount somewhere between eleven and fifteen thousand dollars. Reid contended that this check represented the proceeds for work he performed at Brunswick Naval Air Station. He alleged that Depositors converted the check and used it to offset part of the balance on the March loan. Defendant strongly contested this claim and implied at trial that the check in question existed only in Reid's imagination.

On September 20, 1979, Reid received a past-due notice on the March loan. The notice requested payment of $694.84 in interest and stated that the payment had been due on September 5, 1979. Reid testified that this was the first notice he had received concerning the March loan.

On November 5, 1979, Depositors repossessed Reid's personal automobile and one of his vans. Reid discovered one of the vehicles in a lot and attempted to drive it away. He testified that he did not know it had been repossessed and thought it had been stolen. On a complaint by Lawson, Reid was arrested in connection with this incident and was placed for a time in jail.

Reid's business collapsed and he lost his four vehicles and his home. On November 7, 1979, Reid filed a Chapter 13 bankruptcy proceeding which was converted to a Chapter 11 proceeding in January, 1980. Mrs. Reid suffered emotional problems and drug dependency. The couple separated for a period of a year and a half.

The Reids, who are black, claimed that Depositors acted in bad faith to limit and then terminate their credit. They also claimed that Depositors' actions were motivated by racial prejudice. Defendant claimed that Depositors acted in good faith to secure its financial interests when it

learned of Reid's personal difficulties and mismanagement of his business; it denied that its actions were racially motivated.

At trial, the district court directed a verdict for defendant on plaintiffs' claims for violations of the Fair Credit Reporting Act and for breach of fiduciary duties. Plaintiffs withdrew their claims for interference with contractual relations and wrongful dishonoring of checks. The jury found for defendant on plaintiffs' claims for violation of the express terms of the credit agreement, racial discrimination, two counts for infliction of emotional distress, and failure to comply with Article 9 of the Uniform Commercial Code. The jury found for plaintiffs on their pendent state claim for breach of the March loan agreement based on violation of an implied covenant of good faith and fair dealing. It awarded plaintiffs $100,000 in compensatory and $500,000 in exemplary damages; the exemplary damages award was struck by the court. Both parties have appealed. In Part II, we address defendant's arguments on appeal; in Parts III–VI we address those of plaintiffs.

## II. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### A. The Existence of the Cause of Action in Maine

Plaintiffs' recovery in contract was based on the theory that when Depositors, in May 1979, and thereafter, shut off Reid's credit and took steps to realize upon its collateral, it violated an implied covenant of good faith contained in the March loan agreement between plaintiffs and Depositors. The district court took as self-evident the proposition that Maine contract law required good faith performance. *See generally* Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369 (1980). The Uniform Commercial Code, as adopted by Maine, states: "Every contract or duty within this Title imposes an obligation of good faith in its performance or enforcement." 4 Me.Rev.Stat.Ann. tit. 11, § 1–203 (1964). That this obligation carries with it a cause of action seems clear from another

provision of the Code: "Any right or obligation declared by this Title is enforceable by action unless the provision declaring it specifies a different and limited effect." *Id.* at § 1–106(2). *See also* Restatement (Second) of Contracts § 205 (1979).

We interpret the Maine cases making reference to the general duty of good faith in light of this general acceptance of the principle. The Maine Supreme Judicial Court has explicitly recognized the U.C.C.'s "broad requirements of good faith, commercial reasonableness and fair dealing." *Schiavi Mobile Homes, Inc. v. Gironda,* 463 A.2d 722, 724–25 (Me.1983) (citing U.C.C. §§ 1–203, 2–103 & 1–106, Comment 1). In addition, some aspects of the present case concern the handling of Reid's bank accounts with Depositors and would thus be governed by the standard of "good faith" and "ordinary care" under section 4–103 of the U.C.C. *See C–K Enterprises v. Depositors Trust Co.,* 438 A.2d 262, 265 (Me.1981).

In *Linscott v. State Farm Mutual Auto Ins. Co.,* 368 A.2d 1161 (Me.1977), the court discussed whether a duty of good faith existed between an insurer and a third-party tort claimant. The court stated that, while such a duty is "implicit" in the contract between an insurer and its insured, the essentially "adversary" relationship between an insurer and a third-party claimant precludes the finding of such an implicit duty in their dealings. Defendant would have us view the court's finding of a good faith duty between the insurer and the insured as exceptional; under defendant's interpretation, an "adversary" relationship, whether contractual or not, would have no good faith requirement.

■ We cannot agree with this reading of *Linscott.* The general principles of modern contract law, as embodied in Maine's Uniform Commercial Code and recognized in *Schiavi,* mandate that we interpret *Linscott* as finding no duty of good faith toward a third-party claimant primarily because of the absence of a contractual relationship. We view the Maine court as implicitly recognizing that contractual relationships of the present nature are gov-

erned by a requirement of good faith performance. We do not think that this duty to perform in good faith is altered merely by calling the contractual relationship "adversary."

■ Defendant next argues that a *cause of action* based on the duty is not generally accepted, even if the *principle* of good faith performance has been widely acknowledged. Defendant cites several cases finding no such cause of action in their jurisdictions. *See, e.g., Management Assistance, Inc. v. Computer Dimensions, Inc.,* 546 F.Supp. 666 (N.D.Ga.1982), *aff'd,* 747 F.2d 708 (11th Cir.1984). These cases generally cite as their authority *Chandler v. Hunter,* 340 So.2d 818, 821 (Ala.App. 1976), for the proposition that *no* jurisdiction has been found that allows such a cause of action.

We reject the applicability of *Chandler* and the cases based on it for two reasons. First, a determination that no such cause of action exists would conflict with the clear meaning of section 1–203 of the U.C.C., particularly when read in conjunction with section 1–106(2). We assume that the Maine courts would adhere to the plain language of these provisions, as well as to generally accepted modern contract principles. Secondly, the fact that numerous jurisdictions have allowed recovery on theories of breach of good faith refutes the empirical assumption upon which *Chandler* appears to have been based. *See, e.g., K.M.C. Co. v. Irving Trust Co.,* 757 F.2d 752 (6th Cir.1985) (suit under New York law by borrower against lender for arbitrary termination of credit); *Power Motive Corp. v. Mannesmann Demag Corp.,* 617 F.Supp. 1048 (D.Colo.1985) (Ohio law); *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977) (Massachusetts law). *See also Atlas Truck Leasing, Inc. v. First NH Banks, Inc.,* 808 F.2d 902 (1st Cir.1987) (interpreting New Hampshire law).[1]

## B. The "Demand" Provision

Defendant argues that the "demand" provision of the note establishing the credit agreement precludes a good faith requirement in this case, even if such a requirement is recognized in general. Defendant contends that this exception to the general good faith requirement is mandated by section 1–208 of the U.C.C., as interpreted by the U.C.C. Comment to the section. Section 1–208 states:

§ 1–208. **Option to accelerate at will**

A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired....

The U.C.C. Comment observes:

Obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason.

We turn, therefore, to the documents establishing the loan to see whether they clearly gave Depositors the right to demand payment or terminate the relationship on demand and without cause. The "Secured Interest Note," dated March 2, 1979, states in its opening paragraph:

On Demand, after date, for value received, [Paul Reid d/b/a Pro Paint & Decorating] ... promise[s] to pay to the order of [Depositors] ... Twenty-five Thousand and no/100 DOLLARS with interest at 13.75 per cent per annum payable quarterly.

This provision appears, at first glance, to be an unambiguous demand clause. It cannot, however, possibly be read literally in the context of the kind of agreement entered into here. Although the note seems to grant Depositors the right to immediate repayment of $25,000 "on demand," Reid had not yet received that sum of money

---

1. For an extensive list of jurisdictions recognizing the general obligation of good faith, see the appendix to Burton, *Breach of Contract and the* *Common Law Duty to Bargain in Good Faith,* 94 Harv.L.Rev. at 404.

from the bank. Indeed, he was never to receive the full amount. The "demand" provision thus cannot represent the beginning and end of the inquiry into the time term of the contract.

■ DeSalle, president of Depositors, testified to similar effect at trial, based on his knowledge of banking practices. He said that the "demand" provision in such an agreement is to be interpreted in light of the other conditions in the note and that a bank could not simply terminate the agreement capriciously. He also thought that the absence of a time term in such a note indicated the likelihood that the schedule for repayment of the principal was governed by a verbal agreement between the loan officer and the debtor. In view both of our reading of the document and of DeSalle's testimony about banking practices, we find that the "demand" provision in the note should not be understood as a completely integrated agreement on the time term of the contract. *See Astor v. Boulos Co.*, 451 A.2d 903, 905 (Me.1982); Restatement (Second) of Contracts § 209 (1979).

■ Furthermore, the documents establishing the loan place conditions on the acceleration of payment or termination of the agreement. The "Secured Interest Note" provides for various conditions which would "render" the obligation "payable on demand." The "Security Agreement," also signed March 2, 1979, lists a series of events whose occurrence would signify that Reid would be in "default." The presence of such conditions in both documents indicates that the agreement could not simply be terminated at the whim of the parties; rather, the right of termination or acceleration was subjected to various limitations. The detailed enumeration of events that would *"render"* the note "payable on demand," or which would put Reid in "default," shows the qualified and relative nature of any "demand" provision. It would be illogical to construe an agreement, providing for repayment or default in the event of certain contingencies, as permitting the creditor, in the absence of the occurrence of those contingencies, to

terminate the agreement without any cause whatsoever. Under such a construction, the enumerated conditions would be rendered meaningless. We find, therefore, that the documents establishing the loan defeat neither the legal obligation nor the justifiable expectation of the parties that the contract be performed in good faith.

## C. The Standard

Defendant challenges the district court's formulation of the test of "good faith" in its instruction to the jury. Defendant claims that the judge instructed the jury that the test for good faith comprises both an objective and a subjective component. Defendant argues that under Maine law an objective standard, such as a "reasonable man" test, may only be applied in cases involving the sales of goods that fall under Article 2 of the U.C.C. Otherwise, defendant claims, any consideration of "good faith" should be limited to its subjective definition in section 1–201(19) as "honesty in fact."

We have examined the judge's original instructions as well as his subsequent clarification of those instructions to determine the precise nature of the test submitted to the jury. In regard to the contract claim, the judge initially formulated two standards. First, he stated that the contract, as a whole, was subject to a "covenant of good faith and fair dealing." Second, with specific reference to the claim that Depositors inappropriately disposed of Reid's collateral, he stated that the bank had a duty to act in a "commercially reasonable manner." In setting the latter standard, he cited Article 9 of the U.C.C. *See* 5 Me.Rev. Stat.Ann. tit. 11, §§ 9–501–504. He then twice defined "good faith" in terms indicating a purely subjective standard. He concluded the instruction, however, by reformulating the "good faith" test as including an objective standard of reasonableness.

The jury later requested that the judge clarify these instructions. In his new instructions, the judge clearly formulated a subjective standard for good faith:

Now good faith is defined as honesty in fact.

One acts with good faith, in general, when one acts honestly.

Good faith means that one acts without any improper motivation. One acts with the truth and not for some ulterior motive that is unconnected with the substance of the agreement in question when one is acting with good faith.

The judge again referred to the "commercially reasonable" standard only in connection with Article 9 violations.

█ We find, therefore, that the judge ultimately instructed the jury to decide the issue of good faith under the subjective standard. "Honesty in fact" is required under all interpretations of the duty of good faith under section 1–203. Thus, even if we agreed with defendant that the Maine courts would limit an objective standard for good faith to Article 2 cases, we would not find a fatal error in the judge's instructions here.[2]

### D. Sufficiency of Evidence

█ Finally, defendant contends that there was insufficient evidence to support a finding of an absence of good faith, particularly in view of the jury's failure to find that racial discrimination had been an "effective factor" in the termination of Reid's credit at Depositors. We disagree. We affirm the district court's holding that evidence concerning the manner in which Depositors conducted their dealings with Reid was sufficient to support a jury verdict of bad faith and was not based on mere speculation. The standard for defendant's motion for a judgment notwithstanding the verdict was whether the evidence, viewed in the light most favorable to plaintiffs, would lead to the conclusion that no reasonable jury could have found for plaintiffs on the good faith issue. This heavy burden was not met by defendant.

We think the jury could have reasonably inferred that Depositors' actions were not taken in good faith. The March, 1979, credit agreement represented the largest amount of credit extended to Reid by the bank, and could be seen as the culmination of an ongoing and mutually beneficial relationship. The jury could have found that by mid-May, when Reid's line of credit was abruptly shut off, he was not in default and his overall position had not changed that significantly, especially as the bank did not first register complaints to him or ask him to alter his conduct in some manner. The bank's president testified that it was customary before cutting off a customer's line of credit to send notices in advance and call the customer to the bank for discussion. This was not done as to Reid, nor was any convincing reason advanced by the bank for not doing so. (The bank, indeed, did not even call as a witness the officer who had dealt directly with Reid and could have best explained why the bank acted as it did.) The jury could have found that in restricting Reid's credit when and as it did the bank was motivated by ulterior considerations, not a good faith concern for its financial security. The jury could have found that the bank decided in bad faith and without notice to terminate the credit relationship as a whole. The jury might have viewed the bank's actions to restrict and terminate Reid's credit to be in bad faith in part because they were taken only a short time after the bank had

---

2. Moreover, we think there are strong indications that such a limitation would not represent the Maine court's future, or even current, thinking on this matter. First, we note that many courts have construed the "good faith" provision of § 1–208 as including an objective component. *See, e.g., K.M.C. Co. v. Irving Trust Co.,* 757 F.2d 752, 760–61 (6th Cir.1985). This construction was supported by the views of Professor Gilmore, one of the drafters of the U.C.C. *See* 2 G. Gilmore, *Security Interests in Personal Property* § 43.4 at 1197 (1965). *See also* J. White and R. Summers, *Uniform Commercial Code* 1088 (2d ed.1980) ("The draftsmen apparently intended an objective standard."). Moreover, as many commentators have shown, the difference between so-called "objective" and "subjective" standards is often minimal in practice. *See, e.g.,* J. White and R. Summers at 1088–90. Finally, we note the following pronouncement of the Maine court, broadly paraphrasing § 4–103 of the U.C.C.: "[I]n fact the Uniform Commercial Code imposes a duty of ordinary care and good faith on banks in their dealings with customers." *C–K Enterprises v. Depositors Trust Co.,* 438 A.2d 262, 264 (1981). The use of the sweeping phrase, "in their dealings with customers," arguably extends the protection of "ordinary care" in Maine beyond those bank transactions specifically covered in Article 4.

shown confidence in Reid and had given him grounds to rely on the continuation of the relationship. The jury might have inferred bad faith from these actions of the bank, even if it did not believe that racial prejudice was the effective factor that motivated the bank's bad faith. In sum, the jury could have reasonably found that the bank acted in bad faith in precipitously and without warning halting further advances on which it knew Reid's business depended, in failing to make a sufficient effort to negotiate alternative solutions to any problems it perceived in its relationship with Reid, and in failing to give notice that it intended to terminate the relationship entirely. The evidence concerning these and other aspects of Depositors' actions provided a sufficient basis for a jury finding that the bank's actions were not taken in good faith.

## III. EXEMPLARY DAMAGES

The jury awarded plaintiffs $500,000 in exemplary damages. This award clearly related to the finding of a breach of the implied covenant of good faith because the jury found for defendant on all other counts. The district judge struck the exemplary damages award, stating that he had specifically charged the jury that exemplary damages could not be awarded on a contract claim in Maine.

Plaintiffs contest the district court's finding that it had not submitted to the jury the issue of exemplary damages on the contract claim. Our examination of the record supports the district court's finding. There is no merit in plaintiffs' procedural argument. Plaintiffs also argue that ex-

emplary damages are available in Maine in exceptional circumstances.

Under Maine law, "[a]s a general rule, exemplary damages are not recoverable for a breach of contract." *Forbes v. Wells Beach Casino, Inc.*, 409 A.2d 646, 655 (Me. 1979). Plaintiffs argue that this "general rule" admits of an exception when the breach amounts to an independent, recoverable tort. This view of the general state of the doctrine of exemplary damages is not without merit. *See, e.g., In re Blier Cedar Co.*, 7 B.R. 195, 196 (D.Me.1980) (interpreting Maine law as containing the "tort" exception).[3]

■ We need not, however, reach this legal question here because there are no recoverable torts to which the exemplary damages could attach. The jury found for defendant on the conversion count, plaintiffs withdrew their claim for intentional interference with contractual relations and wrongful dishonoring of checks, and the court directed a verdict for defendant on the count for breach of fiduciary duties. Even if we were to accept plaintiffs' legal argument, therefore, we would not find exemplary damages appropriate in this case.

## IV. BREACH OF FIDUCIARY DUTIES

The district court directed a verdict for defendant on plaintiffs' claim for breach of fiduciary duties. The district court's holding may be divided into factual and legal components. The court found that "under the facts of this case, no showing is made of a fiduciary or [what is] sometimes referred to under Maine law as a confidential relationship."[4] The court went on to state that, in the debtor/creditor context, a find-

3. We must, however, be very careful in finding an implied extension of exemplary damages under Maine law; the Maine courts have expressed reservations about the appropriateness of awarding exemplary damages under *any* circumstances. *See, e.g., Braley v. Berkshire Mutual Ins. Co.*, 440 A.2d 359, 361 n. 4 (Me.1982); *C–K Enterprises v. Depositors Trust Co.*, 438 A.2d at 265 n. 11.

4. In Maine, "fiduciary" and "confidential" relations are legal equivalents. *See Ruebsamen v. Maddocks*, 340 A.2d 31, 36 (Me.1975). We will generally refer to the relation alleged here as

"confidential" since it does not fall into any of the technical fiduciary relations such as that between guardian and ward. *See G. Bogert, Trusts and Trustees* § 482 (2d ed. 1978). We note, also, that, except in the above quote from the district judge, we use the terms "relation" and "relationship" as do the Maine courts. "Relation" generally denotes a legal rubric, as in the phrase "confidential relation." "Relationship" refers to a particular factual situation which may or may not be characterized as a legal "relation." *See, e.g., Ruebsamen*, 340 A.2d at 35.

ing of a confidential relation is excluded in principle; to hold otherwise, the court declared, would disrupt "a whole system of credit that exists in the economic marketplace in this country."

While there are no Maine cases directly on point, we have reservations about the sweeping legal rule announced by the district court. A review of cases from other jurisdictions shows that courts are split on the issue of whether, and in what circumstances, a confidential relation may be implied between a bank and its depositors or loan customers. Some courts agree with the district court in stating flatly that no such relation exists. *See, e.g., Centerre Bank of Kansas City v. Distributors, Inc.,* 705 S.W.2d 42 (Mo.App.1985). Other courts, however, hold that such a relation may arise when a customer "reposes trust in a bank and relies on the bank for financial advice, or in other special circumstances." *Baylor v. Jordan,* 445 So.2d 254, 256 (Ala.1984). In those jurisdictions holding the second view, the existence of a confidential relation is generally determined as a matter of fact; the extent of the factual showing required varies according to jurisdiction. This second view, we note, appears to be that of the majority of courts that have reached this issue.[5]

Statements in Maine cases suggest that the Maine courts, were they presented with the question, might agree with the majority view that such relations cannot be excluded *per se* from the context of banks and their depositors or loan customers. In Maine,

> the "fiduciary or confidential relation" concept when used in connection with improper influence affecting the validity of some transaction [is] one of broad application and ... it embrace[s] not only technical fiduciary relations ... but may also encompass relationships wherein confidence is actually reposed in another by reason of their social ties....

*Eaton v. Sontag,* 387 A.2d 33, 36 (Me.1978) (cite omitted).

Nevertheless, whatever reservations might be expressed as to the district court's general discussion of the legal rule, we agree with its primary holding that the evidence presented in this case does not suffice to prove a confidential relation under Maine law. In Maine, "a general allegation of a confidential relation is not a sufficient basis for the existence of one." *Ruebsamen v. Maddocks,* 340 A.2d 31, 35 (1975) (cite omitted). Rather, "the facts constituting the alleged relationship must be set forth with sufficient particularity" for an accurate determination of the matter. *Id.*

In the present case, plaintiffs appear to rely for evidence of a confidential relation primarily on the high quality of the working relationship between Paul Reid and Peter Traill prior to May, 1979. A good working relationship between two parties, however, is not sufficient evidence for a finding of the existence of the special legal obligations of a confidential relation. *See Eaton,* 387 A.2d at 37. Moreover, contrary to plaintiffs' contention, Depositors was not Reid's only source of financial support; he had received a loan from the Small Business Administration. The only concrete facts alleged to show a relationship going beyond the ordinary bank/customer situation were the recommendations by Traill that Reid use a particular supplier of paint and a particular accountant. In his testimony at trial, however, Reid discussed these recommendations in terms leaving vague the weight of Traill's influence and the significance of his recommendations on the general conduct of Reid's business. Reid specifically denied discussing with Traill the organization of his financial records and the day-to-day management of work being performed by his company. Reid could not recall any discussions with Traill concerning problems with his financial planning and general schedule.

---

**5.** Indeed, as early as 1937, at least one court was of the view that the complexity of modern financial arrangements was such as to warrant the finding of a confidential relation between a bank and its customers under the appropriate circumstances. *See Stewart v. Phoenix National Bank,* 49 Ariz. 34, 64 P.2d 101 (1937).

Finally, plaintiffs rely on Reid's inexperience and the "disparity of position" between Reid and the bank as supporting a finding of a confidential relation. By May, 1979, however, Reid had been involved in the paint business, in various capacities, for approximately six years. Nor was there any evidence of the kind of diminished emotional or physical capacity or of the "letting down of all guards and bars" that is implied by the use of the term "disparity of position" in the context of confidential relations in Maine. *See Ruebsamen,* 340 A.2d at 35 (citing G. Bogert, *Trusts and Trustees,* § 482 (2d ed. 1960)).

Thus, we need not decide the broader legal issue raised by the district court. We affirm the directing of a verdict by the district court on the grounds that insufficient evidence of a confidential relation was presented to warrant a jury determination of this issue.

### V. THE CONVERSION COUNT

In instructing the jury on Count Thirteen for conversion of Reid's funds, the district court referred only to the alleged check for work at Brunswick Naval Air Station. Plaintiffs argue that the court should also have instructed the jury on a claim for conversion of the check from Nickerson & O'Day. While the complaint only mentions the Brunswick check, plaintiffs contend that the reference in Count Thirteen to the "set[ting] off [of] all the monies in Plaintiff's account at Depositors," sufficed to warrant an instruction on the Nickerson & O'Day check as well as the Brunswick check.

■ We find that any error in the court's instructions was harmless. In Count Twelve, plaintiffs also alleged the improper setting off of sums in Reid's account against the loan balance. This claim was phrased in substantially the same terms as the language in Count Thirteen that plaintiffs seek to construe as extending to the handling of the Nickerson & O'Day check. The jury found for defendant on Count Twelve, thereby signifying that it found no impropriety in the handling of the funds in Reid's account at Deposi-

tors. The jury, however instructed, could not have returned a contrary verdict on the substantially identical issue in Count Thirteen.

### VI. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

The district court instructed the jury that Count Fifteen was a claim for the intentional infliction of emotional distress on Mrs. Reid. Plaintiffs argue that Count Fifteen is more properly construed as a claim for the negligent infliction of emotional distress. Plaintiffs contend that the court, in effect, directed a verdict on their negligence claim and that this ruling was improper.

■ We find, however, that there was no reversible error in the court's instructions, regardless of the proper construction of the ambiguous language of Count Fifteen. In Maine, "negligent infliction of emotional stress is not an independent tort, but is more properly to be perceived as subordinate to the principal cause of action." *Packard v. Central Maine Power Co.,* 477 A.2d 264, 268 (Me.1984). A finding of liability for an "underlying tort" is a "condition precedent to recovery" on a claim for negligent infliction of emotional distress. *Id.* at 269. As we have already noted, defendant in this case was not found liable for any primary tort. Any alleged error in the court's failure to instruct on the "subordinate" claim was, therefore, harmless.

*Affirmed.* No costs to either party.