This is an action against a bank for wrongful cancellation of a line of credit. Pavco Industries, Inc., and Timsco, Inc., sued First National Bank of Mobile. The last amended complaint included claims sounding in fraud, breach of contract, conversion, tortious breach of contract, and economic duress. The trial court granted summary judgment for First National.
Timsco is an Alabama corporation doing business in Mobile. On April 5, 1982, Timsco executed a promissory note and security agreement by virtue of which First National extended a $400,000 line of credit secured by Timsco's accounts receivable. The note was renewed informally several times before a new note was executed on December 28, 1982. That note is in evidence, and includes the following provision under the heading "payment schedule": "ON DEMAND, but if demand not sooner made, June 10, 1983." This note was informally renewed several times before February 1984, when an extension to October 31, 1984, was executed by the president of Timsco and by Alfred K. Seibt, vice president of First National, who had been servicing the loan from its inception.
Timsco used the line of credit for operating capital and periodically made payments on the loan by collections of its accounts receivable. Before and after the time of the February 1984 renewal, negotiations were proceeding regarding Timsco's financial condition and its ability to pay the note. Such considerations led to the investment by Pavco, a Delaware corporation with its principal place of business in Mississippi,[1] of $170,000 into Timsco, by virtue of which Pavco became a major stockholder in Timsco. Robert J. Boland, owner of 100% of the stock of Pavco, negotiated with Seibt about Timsco's finances and later assumed the management of Timsco.
Timsco and Pavco contend that, during the negotiations in early 1984 that resulted in Pavco's investment in Timsco, Seibt renewed the note to May 31, 1985, and assured them that First National would not demand payment on its note as long as Timsco continued to show improvement. They contend that Pavco's investment was conditioned upon this understanding, and that Seibt knew that this was the condition of Pavco's injection of capital.
In August 1984 First National transferred responsibility for the Timsco note from Seibt, in its Commercial Lending Department,[2] to John Gillis, in its Special Assets Department, where delinquent or problem loans were sent. Gillis insisted on restrictions on the line of credit, and his insistence resulted in disputes between the parties. On September 27, 1984, Gillis notified Timsco's account debtors to make payments directly to First National. It is not clear that First National formally declared Timsco in default or exercised the demand provision of the note, but Timsco paid the note in full on November 19, 1984, allegedly at great cost in obtaining the sums to pay the balance due.
The chief items introduced in support of the claim that First National agreed not to demand payment on the note before May 31, 1985, are a letter and Seibt's deposition. Timsco sent a letter with the following *Page 574 
pertinent provisions to Seibt on June 4, 1984:
 "In connection with an examination of our financial statements, please confirm to our auditors, Touche Ross Co. . . ., the following information relating to our note payable to you as of April 30, 1984. [Timsco then recited the balance, the date made, how the note was due ("Demand"), the interest rate, and the collateral.]
 "In addition, it is our understanding that while this is a demand note, you have agreed that you will not demand payment until May 1 [sic], 1985 and will not require that the balance be reduced below $400,000 during this period. If this agrees with your records, please confirm this information to our auditors."
(Emphasis in original.)
The letter included, under the word "confirmation," the statement, "The information described above is correct except as noted below." Seibt wrote:
 "The interest rate is prime plus 1 1/2%. The changes in the accrued rate takes [sic] place on the 10th of each month. On April 30, 1984 the rate was 13 1/2%. This note is a demand note supporting our commitment to extend a line of credit of up to $400,000 to this company. We have agreed to extend the expiration date of our line of credit commitment to May 31, 1985. Our commitment is to fund up to $400,000 but not to exceed 80% of collateral accounts receivable."
Timsco and Pavco contend that Seibt's failure to deny that he had agreed not to demand payment before the due date was an admission that he had so agreed.
The following exchanges took place during Seibt's deposition:
 "Q. Wasn't he [Boland], in fact, asking the bank to make a commitment to extend the line of credit and not call the loan until May of 1985?
 "A. He was asking that that be the position, but when he did, the fact that it was a demand note was brought to his attention.
 "Q. Well, would you tell me, please, how you responded when he directly presented that to you, to the best of your recollection?
 "A. To the best of my recollection, I told him that as long as he was in the picture and as long as he was continuing to exert the improvements that I saw that he had already brought to the business, and as long as there were no new deterioration in the operation of this business or anything that would indicate it was going back downhill, that I felt very confident that the bank would continue to offer him that credit that was then in place.
 "Q. Did Mr. Boland ever tell you that it was his understanding that the bank would not call this loan or demand payment of this loan until May of 1985?
 "A. Mr. Boland will try to put words in your mouth. He discussed that with me, and each time that he did, I specifically called to his attention that any deterioration in the business would . . . present a situation that the bank would view its option to demand payment of the debt, but so long as he continued to show improvement in the business, the bank would continue to have the line of credit made available to him.
". . . .
 "Q. During July of 1984, did you advise Pavco and Timsco that you would work with those companies to allow Timsco to work out its problems?
 "A. I don't remember dates, but I had a number of conversations with Bud Boland after he became involved in this company that indicated to him my willingness to continue to retain the line of credit so long as he continued to exert his efforts that he was showing to me at that time in the way of making improvements in this particular company's operation."
On the question of fraud, First National argues that the alleged fraud involves a promise to perform an act in the future and therefore requires allegation and proof of intent not to perform at the time the promise was made. PurcellCo. v. Spriggs Enterprises, Inc., 431 So.2d 515 (Ala. 1983). Timsco and Pavco attempt to characterize *Page 575 
the alleged fraud as being a misrepresentation, not of Seibt's intent to perform his promises, but of other facts existing at the time the representations were made in the first half of 1984. We find this attempt to distinguish the alleged fraud from promissory fraud to be unconvincing. Indeed, First National correctly points out that the complaint itself makes clear that the alleged fraud was the alleged promise that First National would not demand payment on the note before May 31, 1985:
 "On or about February 20, 22, 24, April 27, and May 18, 1984, at the Defendant's offices, Defendant, through its agent Alfred K. Seibt, acting within the line and scope of his employment, falsely and with intent to deceive or recklessly, represented to Robert Boland, Chairman of the Board and Chief Executive Officer of Pavco, and Buddy Hargrove, an officer of Timsco, and other officers and shareholders of Timsco, that Defendant had agreed not to call the loans of Timsco before May 31, 1985, that the loan had been extended to May 31, 1985, that it would not require that the outstanding principal be reduced below $400,000, and that it would lend amounts equal to 80% of all accounts receivable of Timsco.
 "By letter dated June 8, 1984, Defendant, through Alfred K. Seibt, . . . acknowledged to Plaintiffs Defendant's agreement to extend the loan of Timsco until May 31, 1985 and not to require reduction of the balance of the loans below $400,000.
 "Defendant's misrepresentations were false and were material. Pavco, in reasonable reliance on Defendant's representations, invested substantial amounts of money in Timsco. Timsco in reasonable reliance on Defendant's representations continued to borrow money from Defendant.
 "In disregard of its contractual agreements, and even though the loan was not in default, Defendant on or about October 10, 1984, called the loans and by letters dated September 27, 1984, and September 28, 1984, notified acount debtors of Timsco to make all payments directly to Defendant and payable jointly to Timsco and Defendant."
The bank did extend the expiration date to May 31, 1985, but this only caused the note to be payable "on demand, but if demand not sooner made, May 31, 1985." Thus, it can be seen that the only frauds alleged were that First National promised (1) not to call the loan until May 31, 1985, (2) to refrain from requiring that the balance be brought below $400,000, and (3) to continue to lend amounts equal to 80% of all accounts receivable. There is some evidence that Seibt made representations that could have been taken to mean that First National would not reduce or cancel the loan so long as Boland continued to make efforts that resulted in Timsco's improvement.
There was nothing presented, however, that tended in the least to show that at the time Seibt made these promises he intended not to perform them. Timsco and Pavco introduced a note that Seibt wrote to the credit file on April 4, 1984, when recommending the extension. This note was presented to the loan committee on April 6. Pavco and Timsco contend that the note is evidence that Seibt did not intend to perform as promised. The note includes the following:
 "Our line of credit of $400,000.00 is presently set to come up for reconfirmation in October 1984. He [Boland] has asked us to extend this reconfirmation date to May 1 [sic], 1985, which would be beyond his next year end. This he feels would allow his accountants to move this debt out of current liabilities and should improve the ratios of Timsco. As the master note under which the line draws has a demand feature, we would still have the ability to call the note if we felt insecure.
 "As this company is now making positive strides, I recommend we change the reconfirmation date to May 31st, 1985, as requested."
Rather than being evidence of intent to deceive, this note is entirely consistent with the alleged and admitted representations that Seibt would recommend continuance of *Page 576 
the loan as long as Timsco continued to improve.
The materials submitted in support of the summary judgment motion made a prima facie showing that Seibt had no present intent to deceive at the time he made the representations concerning continuance of the line of credit, and the materials presented in opposition did not show a genuine issue of fact in that regard. Therefore, under the rule of law explained in Purcell Co. v. Spriggs Enterprises,Inc., supra, and applied in such cases as Dobbins v.Dicus Oil Co., 495 So.2d 587 (Ala. 1986), andHearing Systems, Inc. v. Chandler, 512 So.2d 84
(Ala. 1987), the trial court properly granted summary judgment on the fraud counts. See Rule 56, A.R.Civ.P.
Timsco and Pavco next argue that First National breached the contract in the following respects:
 "1) in refusing to make further advances and demanding repayment of the loan, 2) in attempting to default Timsco and to accelerate full payment of the loans, 3) requiring the reduction of the outstanding principal below $400,000.00, 4) in not loaning against 80% of all accounts receivables, 5) in notifying the Timsco account debtors to make direct payment to FNB, and 6) in failing to act in good faith as required by the loan agreement."
The arguments numbered 3) and 4) can be disposed of initially. Timsco and Pavco argue that Seibt's assurances became part of the contract and that it was therefore a breach of contract to fail to comply with those assurances. The fatal flaw in this argument, however, is that the note included the following provision: "This agreement shall be changed only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, or discharge is sought." Thus, there can be no oral modification of the written note and security agreement.Williams v. Ford Motor Credit Co., 435 So.2d 66
(Ala. 1983).
Timsco and Pavco assert that the above-quoted letter constitutes a written modification, but, on the contrary, Seibt's reply, by fully setting forth the applicable terms without including the proposed limitations on First National's right to call the note due, unambiguously rejects them. Seibt's reply, "Our commitment is to fund upto $400,000 but not to exceed 80% of collateral accounts receivable," is not susceptible to the interpretation that First National was modifying its contract and agreeing to lend no less than these amounts. Thus, the trial court did not err in granting summary judgment in this respect.
The remainder of the arguments essentially depend upon the premise that the contract was modified so that First National could demand payment only if Timsco's financial condition deteriorated. As we have shown, there was no such modification of the loan agreement.
Timsco and Pavco emphasize the provision of the loan providing that an "event of default" occurs if "the Bank in good faith deems itself insecure." They argue that First National relied on this insecurity provision in calling the note due and that there is a fact question presented as to whether First National in good faith deemed itself insecure. With the demand provision in the note, however, First National did not have to declare a default in order to demand payment, so this provision never came into play.
They also cite the provisions of the Uniform Commercial Code making good faith a duty imposed by contracts within the U.C.C.'s coverage. Ala. Code 1975, § 7-1-203, provides: "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement." Section 7-1-208 provides:
 "A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral 'at will' or 'when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party *Page 577 
against whom the power has been exercised."
Timsco and Pavco argue that these sections will support a cause of action for their breach, citing § 7-1-106(2) and cases such as Reid v. Key Bank of Southern Maine,Inc., 821 F.2d 9 (1st Cir. 1987).[3] We pretermit discussion of whether such an action would lie in an appropriate instance, because the committee comments to § 7-1-208 except demand instruments from that section's operation: "Obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason." Section 7-1-208, being more specific, supersedes any general good faith duty imposed under § 7-1-203, and thus the U.C.C. does not impose a good faith requirement on the right to demand payment under a demand note.
The court in Reid held that the demand feature of the note was limited by virtue of provisions in the note stating that the bank could demand payment upon default: "The detailed enumeration of events that would 'render'
the note 'payable on demand,' or which would put Reid in 'default,' shows the qualified and relative nature of any 'demand' provision." 821 F.2d at 14. Although the note before us also lists "events of default" that give First National the option to demand immediate payment, these are printed terms in the form note. The printed terms under "Payment Schedule" allow the same form to be used for different installment and term notes. The default provisions would properly apply to those kinds of notes, and would not limit the right to call a note such as this on demand. Moreover, the payable-on-demand provision is typed, and typed provisions govern over printed ones. Ala. Code 1975, §7-3-118(b).
Timsco and Pavco similarly cite KMC Co. v. Irving TrustCo., 757 F.2d 752 (6th Cir. 1985), which dismissed the demand provision as "a kind of acceleration clause, upon which the Uniform Commercial Code and the courts have imposed limitations of reasonableness and fairness." Id., at 760. We decline to follow that construction of the demand provision in the note before us. The demand feature is an integral part of the note, as shown both by internal features of the note, such as the rate of interest and the fact that interest was recalculated monthly, and by the parties' actions, such as Seibt's repeated reminders to Boland of the demand aspect.
Timsco's and Pavco's other claims and arguments also depend upon a holding that First National could demand payment only upon default, and so require no further discussion.
For the foregoing reasons, the judgment is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, BEATTY and HOUSTON, JJ., concur.
[1] First National claims that Pavco should have been dismissed as a party, because it is a foreign corporation not qualified to do business in Alabama. See Ala. Const. of 1901, § 232. Pavco counters that it is suing as a third-party beneficiary of the contract with Timsco. Because Timsco is a proper party plaintiff and because the issues are the same as to both plaintiffs, we express no opinion on this question.
[2] Seibt left First National about August 17, 1984.
[3] We note that the Court in Reid disapproved ofChandler v. Hunter, 340 So.2d 818 (Ala.Civ.App. 1976).