ROGER G. AND ELAINE M. SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket No. 22142-83.
United States Tax Court
T.C. Memo 1986-101; 1986 Tax Ct. Memo LEXIS 506; 51 T.C.M. (CCH) 599; T.C.M. (RIA) 86101; March 17, 1986. Roger G. Smith, pro se. Cindy E. Pilsecker, for the respondent. BUCKLEY
MEMORANDUM FINDINGS OF FACT AND OPINION BUCKLEY, Special Trial Judge: This case [1] was assigned to the undersigned pursuant to the provisions of section 7456(d)(3), Internal Revenue Code of 1954, and Rules 180, 181 and 182, Tax Court Rules of Practice and Procedure. *507 [2]
Respondent determined a deficiency of $3,435 in petitioners' 1978 Federal income tax and an addition to tax of $172 for negligence under section 6653(a). The issues for decision are whether petitioners improperly deducted $20,000 as developmental expenditures pursuant to section 616(a) and whether petitioners acted negligently with regard to this deduction. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits thereto are incorporated by this reference. Petitioner, [3] Roger G. Smith, and his wife resided in Foxboro, Massachusetts, at the time the petition was filed. Petitioner filed his 1978 Federal income tax return with respondent's service center in Andover, Massachusetts. *508 On his income tax return, petitioner listed his occupation as investment advisor, however, he showed no wages or commissions from any advisory activities. In reality, petitioner was an investor, and a very successful one at that. For the year in issue, petitioner had income totaling $140,934. [4] After deductions and exclusions, however, petitioner paid only $10,652 in Federal income taxes, all of which was alternative minimum tax due on tax preference items, pursuant to section 55. Petitioner prepared his own Federal income tax return and is obviously well acquainted with the Federal tax law. Respondent concedes that most of petitioner's tax reducing transactions were within the bounds of permissibility. Respondent has, however, disallowed a $20,000 deduction taken by petitioner for mining development expenses pursuant to section 616(a). Toward the end of 1978, petitioner paid $5,000 to International Monetary Exchange (herein IME), a tax shelter promoter, *509 who was promoting a shelter called Gold For Tax Dollars (herein GFTD). In connection with the $5,000 payment made to IME and his execution of a nonrecourse note, petitioner claimed a $20,000 [5] deduction for mining development expense. If properly deductible, the $5,000 payment saved petitioner some $5,979 in Federal income taxes. The GFTD plan provided that IME would obtain for petitioner a mineral lease on certain gold bearing land in southeastern Panama from Diversiones Internacionales, S.A. (herein DISA). [6] Petitioner entered into a mineral claim lease with DISA on December 29, 1978. He thereby obtained a lease on 12,500 cubic meters of auriferous gravel. IME did not charge petitioner anything for its services in obtaining the lease nor did petitioner have to pay anything for the lease itself. [3]
*510 The lease referred to petitioner as miner. The leased premises were described as "Tuquesa Mining Properties Contract No. 35, Republic of Panama Lot #B44 12,500 cubic meters." The lease granted petitioner, as miner-- unrestricted right to enter upon the surface of said leased premises and develop all ore producing sands and soils to exhaustion and for such purposes [miner] shall have the right to free ingress and egress to and from said Leased Premises with such persons and tools necessary for the purpose of testing for gold at any time. Petitioner was not required to mine any gold during the term of the lease, which ran until either petitioner removed for processing the 12,500 cubic meters of soil which was the subject of the lease or DISA's mineral concession expired. DISA retained the right to terminate the lease if petitioner discontinued or abandoned operation of the mining process, but only after notifying petitioner in writing. The lease required petitioner to pay DISA "50% of the recovered gold 'at site' after first deducting all development costs and any mineral tax due [Panama]." Another aspect of the GFTD plan was the so-called loan between IME and petitioner. *511 On December 28, 1978, IME and petitioner, again listed as miner, executed a mineral loan agreement for $15,000 which was to be paid on petitioner's behalf "to an approved contractor for development costs" related to petitioner's mineral interest. The money was lent to petitioner on a nonrecourse basis, which meant that petitioner was not personally liable for its repayment. As its sole security, IME took a "general lien" on petitioner's mineral interest. The only source of repayment of the loan would be the proceeds of the mining operation. The loan bore interest at 10 percent per annum payable annually. Any unpaid interest when due, however, was to be treated as a new advance under the loan agreement. Petitioner never received any proceeds from this so-called loan, as they were purportedly paid to a mining contractor on petitioner's behalf. Petitioner claims to have entered into this transaction with the intention of making a profit. Petitioner claimed as development expense the $5,000 he paid to IME, as well as the $15,000 IME purportedly lent him. Before petitioner invested in the GFTD program, IME supplied him with a promotional brochure entitled Tuquesa Mining Properties *512 (herein the brochure). The brochure purports to describe the location of the alleged mining property and some alleged exploratory work. The brochure also contains some maps and photographs of the purported mineral properties. Copies of an alleged assay report and an alleged statement of a sale of gold, as well as some general information on world gold productions, are also included in the promotional brochure. The assay report and statement of gold sale both were dated June 1975, and were not related to petitioner's specific mineral property. IME also supplied petitioner, prior to his investment, with a tax opinion letter prepared for a Mr. James Mongello by the law firm of Kallen, Grant, May & Tremblatt. The opinion letter discusses the Federal tax implications of an investment in the GFTD plan, which is very similar to that involved here. The import of the opinion letter is that an investment in GFTD is legitimate and would withstand challenge by respondent. OPINION The issue of whether petitioner improperly deducted $20,000 as developmental expense can be separated into two very distinct analyses. Regardless of how we decide the applicability of section 616 with respect *513 to the facts presented here, the portion of the $20,000 deduction represented by the $15,000 nonrecourse loan by IME will not be permitted. That portion of the deduction is controlled by Saviano v. Commissioner,765 F.2d 643 (7th Cir. 1985), affg. 80 T.C. 955 (1983). At trial and in a motion dated June 18, 1984, petitioner agreed to be controlled by the outcome of the Court of Appeals' decision in the Saviano case, which was pending at the time. Except for some minor dissimilarities, [8] the facts of Saviano v. Commissioner,supra, are virtually identical to those presented here. Saviano involved the GFTD program at issue here, including an identical mineral loan agreement. In that case, only the nonrecourse loan portion of the plan was before the court. This is because the Tax Court, for summary judgment purposes, assumed that the transactions occurred as described in the promotional literature. Saviano v. Commissioner, 80 T.C. at 961 and 765 F.2d at 645. The Court of Appeals, affirming the Tax Court, held that the essence of the relationship between IME and the taxpayer was that of joint investors and *514 that no true loan existed between them. Saviano v. Commissioner,765 F.2d at 646-650. There is no reason at this time to hold otherwise, and respondent's determination respecting the $15,000 nonrecourse loan portion of petitioner's $20,000 deduction will be sustained. Since only the nonrecourse loan portion of a GFTD related deduction was before the Court in Saviano v. Commissioner,supra, the deductibility of the $5,000 petitioner paid to IME cannot be decided with such easy reference to a single case. Petitioner claimed this deduction as a development expense under section 616(a) which provides, in part: Except [in the case of an election by the taxpayer under subsection (b)], there shall be allowed as a deduction in computing taxable income all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other *515 than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. Section 616 is not applicable to development expenditures which are deductible under other provisions of the Code, section 1.616-1(b)(1), Income Tax Regs., nor is it applicable to expenditures which are reflected in improvements subject to depreciation. Sec. 1.616-1(b)(2), Income Tax Regs.
Expenditures for development deducted pursuant to section 616 must be incurred on property in which petitioner has previously acquired some proprietary interest. Anderson v. Commissioner,83 T.C. 898, 908 (1984), on appeal (9th Cir., Mar. 5, 1985). Expenses for acquiring the required proprietary interest or for acquiring a right of access to the property are not deductible. Anderson v. Commissioner,supra;Geoghegan & Mathis, Inc. v. Commissioner,55 T.C. 672, 675-676 (1971), affd. 453 F. 2d 1324 (6th Cir. 1972), cert. denied 409 U.S. 842 (1972). In order to qualify for deductibility under section 616, the expenditures must be for development and the mine must have reached *516 the development stage. Estate of DeBie v. Commissioner,56 T.C. 876, 890 (1971). It must be kept in mind that deductions from income are matters of legislative grace, and petitioner is, therefore, required to show that he comes within the terms of the statute under which he is claiming the deduction. New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934). There is a presumption of correctness attached to respondent's deficiency determination and petitioner has the burden of showing it is erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioner can only satisfy this burden by "adequate presentation of the pertinent facts" and cannot rest on assumption or speculation. Wood Corp. of Delaware v. Commissioner,22 B.T.A. 1182, 1186 (1931), affd. 63 F.2d 1023 (6th Cir. 1933). From the aforementioned authorities, it is clear that in order to prevail, petitioner must prove that he had some proprietary interest in gold producing land and that he paid or incurred expenditures for mineral development with respect to that land. Petitioner must also show, however, that the mineral property *517 has reached the development or production stage and that the expenditures were paid or incurred "after such time when, in consideration of all the facts and circumstances * * * deposits of [gold] are shown to exist in sufficient quantity and quality to reasonably justify commercial exploitation * * *." Sec. 1.616-1(a), Income Tax Regs.
Petitioner has failed completely to prove that which need be proven. The only thing which can be determined with certainty is that petitioner paid $5,000 to IME. With respect to the other elements, however, petitioner has not met his burden. The record is devoid of positive proof that the money paid to IME was actually expended for development of gold producing property in whith petitioner had the requisite proprietary interest. [9] Although petitioner paid $5,000 to IME, there is nothing to indicate that the money was spent on development. It is true that the mineral loan agreement refers to petitioner's cash outlay as "miners development capital," but this alone is not sufficient to sustain the proposition that the $5,000 was actually spent on development. In fact, such a proposition is really a soap bubble ready to burst when put in contact *518 with the facts. Such a conclusion would require and petitioner would have us believe that IME, who was promoting GFTD, received no consideration for its promotional activities.Certainly, some of this $5,000 went to IME for promotion. Assuming that GFTD was a legitimate investment, we find it hard to believe that IME would promote such a plan without consideration. [10]
Petitioner still would not prevail, had he shown to our satisfaction that the $5,000 was expended for development, because he failed to prove that the mine had reached the development *519 stage and that he expended the $5,000 after a commercially marketable quantity of gold had been disclosed. Sec. 616(a). Only in the promotional brochure supplied by IME entitled "Tuquesa Mining Properties" is there any reference with respect to these propositions. The problem is that the promotional brochure is a hearsay document and cannot be used as proof of matters asserted within it. This Court follows the rules of evidence in the Federal Rules of Civil Procedure. Rule 143(a). The Federal Rules of Evidence provide for the inadmissibility of hearsay. Fed. R. Evid. 802. Hearsay is defined as an out of court statement "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The statements contained in the promotional brochure certainly come within this definition of hearsay and are inadmissible to show their truth. Since the brochure does not come within any of the recognized exceptions to the hearsay rule, its use must be restricted to showing why petitioner may have participated in the GFTD program. It was for this reason, and this reason only, that the document was received *520 into evidence. Because petitioner has failed to prove that which is required to be proven under section 616(a) he will not be allowed to deduct the $5,000 paid to IME. One may question what sort of proof may have been adequate to satisfy petitioner's burden, however, impossibility of proof is the problem of the party on whom the burden of proof rest. See, e.g., Burnet v. Housten,283 U.S. 223 (1931). Further, we must reject petitioner's claim that he entered into this transaction with the intent of making a profit. The only profit that petitioner appeared to be looking toward was that relating to the decrease in his tax liability from a $20,000 deduction as a result of a $5,000 cash payment. It is well established that transactions entered into primarily for tax benefits are not profit motivated. See Knetsch v. United States,172 Ct. Cl. 378, 348 F.2d 932 (1965), cert. denied 383 U.S. 957 (1966); Fox v. Commissioner,82 T.C. 1001 (1984). See also Thomas v. Commissioner,84 T.C. 1244 (1985), on appeal (4th Cir., Sept. 13, 1985). We now move to determining whether petitioner was negligent with *521 respect to claiming this $20,000 deduction. Respondent determined a $172 addition to tax, pursuant to section 6653(a), which provides for a 5-percent (of deficiency) addition if "any part of any underpayment * * * of any tax * * * is due to negligence or intentional disregard of rules and regulations." Petitioner bears the burden of proving respondent's determination erroneous. Rule 142(a); Enoch v. Commissioner,57 T.C. 781 (1972). Petitioner in this case was a very successful investor. He was obviously well acquainted with Federal income tax law. He prepared his own tax return for 1978, which was very complicated, and did a proficient job.Petitioner claims he believed he was entering into a legitimate transaction was he involved himself in Gold For Tax Dollars. He makes reference to the tax opinion letter which was accepted into evidence. This opinion letter, however, was supplied by IME and, of course, stated that GFTD involvement would withstand Internal Revenue Service scrutiny. He did not independently consult anyone with respect to the propriety of the deduction taken. Given his sophistication with the tax law, we cannot say that his reliance on (if *522 he did so rely) the tax opinion letter supplied to him by the promoter of the tax shelter was sufficient to rebut the presumption operating against him. See, e.g., Mustain v. Commissioner,T.C. Memo. 1982-670. Respondent will be sustained with respect to the negligence addition. Decision will be entered for the respondent.
Footnotes
1. This case was originally filed as a small tax case as provided for in section 7463. On February 21, 1984, petitioners moved to remove this case from the small tax category. The Court, by order dated February 27, 1984, granted petitioners' motion. ↩
2. Section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Elaine M. Smith is a party to this litigation only because the tax return in issue was filed jointly with her husband, Roger G. Smith. Only the activities of Roger Smith are at issue here, and for this reason we will refer to petitioner in the singular.↩
4. Petitioner's income was composed of the following: ↩
Interest
$ 5,048
Dividends
794
Short Term Capital Gain
11,713
Long Term Capital Gain
111,293
Section 1231 gain
12,086
Total Income
$140,934
5. IME purportedly lent $15,000 to petitioner on a nonrecourse basis. This will be discussed more fully infra.↩
6. DISA's interest in the mineral property was purportedly acquired in January 1978 when it entered into a lease with Tuquesa Mining, S.A. (herein TMSA). DISA was granted the right to extract all the gold from properties known as the Tuquesa Mining Properties. TMSA acquired its interest in the Tuquesa Mining Properties when the Panamanian Mining Bureau purportedly granted TMSA Exploration Concesion Contract #35. ↩
3. The mineral lease included the following provision: "For One Dollar and other valuable considerations, Lessor hereby demises [the mineral property]." The promotional literature, however, makes no reference to any such payment, nor does petitioner suggest that he paid any money for the lease.↩
8. The Saviano↩ case was before this Court on motions for partial summary judgment. Obviously, that case involved a different taxpayer. The 1979 was year was involved, as well as 1978. The total deduction in that case was $40,000, with $10,000 being the taxpayer's cash payment to IME.
9. We will assume that the mineral lease executed by petitioner and IME was valid and did grant petitioner the right to mine a specific piece of realty. ↩
10. One could argue that IME's consideration was in finding a captive market for its loans. But this does not comport with common sense and good business judgment. The loans carried a 10-percent annum interest rate at a time when the prime interest rate (a fact of which we take judicial notice), the rate commercial banks charge their most credit worthy customer, was well in excess of 11 percent and on the rise. See Thorndike Encyclopedia of Banking and Financial Tables (1984).↩