**PEOPLE'S HERITAGE SAVINGS BANK, Plaintiff,**

v.

**RECOLL MANAGEMENT, INC., Defendant.**

Civ. A. No. 92–261.

United States District Court, D. Maine.

Feb. 24, 1993.

William K. McKinley, Richardson & Troubh, Portland, ME, Gary Greenberg, Goldstein & Manello, Boston, MA, for plaintiff, People's Heritage.

John Milazzo, Portland, ME, John A. Houlihan, Edwards & Angell, Boston, MA, for defendant, Recoll Management, Inc.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, Chief Judge.

In this six-count action, Plaintiff, People's Heritage Savings Bank ("PHSB") seeks monetary damages from Defendant, Recoll Management ("Recoll"), based on state law claims arising from the alleged breach of a Loan Participation Agreement.[1] The claims include breach of contract (Count I); negligence (Count II); failure to act in a commercially reasonable manner (Count III); breach of covenant of good faith and fair dealing

---

1. The parties agreed, in Section 13(B) of the Agreement, that the Agreement would be governed and construed under the laws of the state of Maine.

(Count IV); breach of fiduciary duty (Count V); and a claim for an accounting (Count VI). Defendant has filed a Motion to Dismiss the Complaint (Docket No. 7) based on Fed. R.Civ.P. 12(c)[2] and 12(h)(2)[3] for failure to state a claim upon which relief can be granted. Plaintiff filed an Objection to Defendant's Motion to Dismiss (Docket No. 10) and a supporting Memorandum (Docket No. 11). Defendant filed a Reply Memorandum in Further Support of its Motion to Dismiss Plaintiff's Complaint (Docket No. 14) and a Motion for Oral Argument (Docket No. 15).

Under Rule 12(c), the Court must accept all of the non-movant's well-pleaded factual averments as true and draw all reasonable inferences in the non-movant's favor, *Rivera–Gomez v. de Castro,* 843 F.2d 631, 635 (1st Cir.1988); and even then, judgment may not be entered on the pleadings "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of a claim that would entitle it to relief." *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). Thus, the moving party must establish that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law. *Lovell v. One Bancorp,* 690 F.Supp 1090, 1096 (D.Me.1988) (citing *Beal v. Missouri Pacific Railroad Co.,* 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577 (1941)).

## FACTS

Accepting all of Plaintiff's well-pleaded factual averments as true and drawing all reasonable inferences in Plaintiff's favor, the facts are as follows. In 1987, Maine Savings Bank ("MSB") entered into a $23 million loan with Diamond Cove Associates, a Maine general partnership. The loan was for the construction of townhouses and single family residences on Great Diamond Island, Portland, Maine. On December 16, 1988, People's Heritage Savings Bank ("PHSB") and MSB entered into a written Loan Participation Agreement ("the Agreement") wherein PHSB agreed to participate with MSB in the note and to purchase an undivided interest therein in the amount of $11.5 million dollars.[4]

The Agreement sets out the terms of the loan participation, explaining the various representations, warranties, and obligations that flow from one party to the other.[5] The Agreement also includes paragraph 12, entitled "Nonrecourse Agreement," which states:

The sale of the loan participation under this Agreement shall be on a "NON–RE-COURSE" basis, except with regard to the

---

**2.** Fed.R.Civ.P. 12(c) provides:

After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

**3.** Fed.R.Civ.P. 12(h)(2) provides:

A defense of failure to state a claim upon which relief can be granted, a defense of failure to join a party indispensable under Rule 19, and an objection of failure to state a legal defense to a claim may be made in any pleading permitted or ordered under Rule 7(a), or by a motion for judgment on the pleadings, or at the trial on the merits.

**4.** The Court notes for future reference that, under the Agreement as written, MSB is referred to as the "Originating Bank" and PHSB is referred to as "the Participant."

Recoll is the successor to MSB's rights and obligations under the Agreement. Section 13(C) provides that:

This Agreement shall be binding upon the parties hereto, as well as their respective successors and assigns.

In order to avoid confusion, this Court will refer to Recoll when discussing the duties assumed by MSB (as the Originating Bank) under the Agreement. Because Recoll's claims flow from its successor status, making the differentiation between Recoll and MSB is unnecessary for the purpose of this Court's present analysis.

**5.** Some of these obligations are explicitly labeled. For example, Section 6 is entitled "Representations and Warranties by Originating Bank," Section 7 is entitled "Representations and Warranties by Participant," and Section 8 is entitled "Additional Obligations of Originating Bank." Other expectations are incorporated into general paragraphs describing the overall functioning of the loan servicing. For example, Section 3 discusses further obligations of the Originating Bank under the heading "Agent for Collection and Servicing."

representations and warranties expressly given herein by each participant to the other.

On February 1, 1991, MSB was taken over by the FDIC. Subsequently, Recoll Management, Inc. ("Recoll") assumed MSB's obligations under the Agreement. PHSB alleges, and this Court takes as true for the purposes of the motion, that Recoll has since:

1) failed and refused to acknowledge PHSB's entitlement to 80% of any repayments, and has indicated in communications with PHSB that it may dispute PHSB's entitlement to 80% of any repayment;

2) failed to accept and consummate a transaction whereby a third party (who wanted to purchase Diamond Cove's assets) would close on such a purchase, acting in direct contradiction to PHSB's directions and causing damage to PHSB;

3) failed to file a timely foreclosure action with respect to certain real estate collateral securing the Diamond Cove loan;

4) failed to initiate collection on additional collateral securing the Diamond Cove loan;

5) in negotiating with obligors, tied resolution of the Diamond Cove loan to settlement of other debts owed to Recoll to which PHSB is not a party;

6) delayed and/or failed to provide to PHSB important written information concerning the Diamond Cove loan, the project and the collateral; and

7) failed to act as PHSB's agent and refused to comply with PHSB's instructions.

## ANALYSIS

■ The threshold issue in the case at bar is one of contract interpretation. The parties dispute the meaning of the language of Section 12 regarding nonrecourse. Defendant argues that Section 12 is a nonrecourse provision that applies to *all* obligations assumed by MSB under the Agreement, thus barring

all of Plaintiff's claims, since each claim stems from an alleged breach of duties assumed under the Agreement. Plaintiff, on the other hand, asserts that the nonrecourse language applies by its terms only to the *sale of the participation interest*, not to all of the servicing and collection obligations under the Agreement. This Court will first address the meaning of paragraph 12, followed by an examination of each individual count of Plaintiff's Complaint.

## I. INTERPRETATION OF PARAGRAPH 12

■ Both parties concede that the Agreement constitutes a contract and that its language should be so analyzed.[6] First, the Court notes that the Agreement is an integrated, final and complete expression of the parties with respect to every term of the Agreement.[7] Next, the Court must examine whether the nonrecourse language in Section 12 is ambiguous. The standards for such a determination are well established under Maine law.

The issue of whether contract language is ambiguous is a question of law for the Court. The interpretation of an unambiguous written contract is question of law for the Court; the interpretation of ambiguous language is a question for the factfinder. The interpretation of an unambiguous writing must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence. Once an ambiguity is found, then extrinsic evidence may be admitted and considered to show the intention of the parties.

*Portland Valve, Inc. v. Rockwood Systems Corp.*, 460 A.2d 1383, 1387 (Me.1983) (Carter, J.) (citations omitted). Contract language is ambiguous when it is reasonably susceptible to different interpretations. *Id.; American*

---

6. *See* Defendant's Memorandum in Support of Its Motion to Dismiss the Complaint (Docket No. 8) at 7, and Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss (Docket No. 11) at 3.

7. A contract is presumed to be integrated "unless it is established by other evidence that the writing did not constitute a final expression." Restatement (Second) of Contracts, § 209(3) (1981). The parties have submitted no evidence that the Agreement is not a final writing setting forth the agreement between MSB and PHSB.

*Policyholders' Ins. Co. v. Kyes,* 483 A.2d 337, 340 (Me.1984).

Under this Court's analysis, the language of Section 12 is unambiguous as a matter of law. Section 12 provides that:

> The sale of the loan participation under this Agreement shall be on a "NON–RE-COURSE" basis, *except with regard to* the representations and warranties expressly given herein by each participant to the other.

(emphasis added). Defendant argues that the phrase "except with regard to the representations and warranties expressly given herein by each participant to the other" is a clear and specifically limited reference to Sections 6 and 7 of the Agreement. Those sections are labeled respectively "Representation and Warranties by the Originating Bank" and "Representation and Warranties by Participant," and, as such, Defendant argues that the Agreement only contemplates recourse for breaches of these specific representations and warranties. Because Defendant's conduct does not consist of any of the specific representations and warranties covered in Section 6 (the "Representations and Warranties by the Originating Bank"), Defendant contends that Plaintiff's claims are automatically barred by the nonrecourse language in the Agreement.

 For a variety of reasons, this Court does not accept Defendant's argument. First, *Black's Law Dictionary* 953 (5th ed. 1979) defines "nonrecourse" as:

> Status of person who holds an instrument which gives him no legal right against prior endorsers or the drawer to compel payment if the instrument is dishonored.

Thus, "nonrecourse" is implicitly limited in its formal legal definition to disallowing recourse on the *underlying instrument.* Furthermore, this definition and understanding of the inherent focus of the word "nonrecourse" has been accepted and adopted, in commercial settings, by the judiciary. Courts generally understand the word "nonrecourse" to denote that the purchaser or holder cannot pursue the seller *on the underlying obligation. See Smith v. Commissioner,* 51 T.C.M. (CCH) 599 (1986) ("the money was lent to petitioner on a nonrecourse basis, which meant that petitioner was not personally liable for its repayment"); *Federal Deposit Ins. Corp. v. University Anclote, Inc.,* 764 F.2d 804, 805 (11th Cir.1985) (the court wrote that "both the note and the mortgage were essentially non-recourse in nature since the bank's sole remedy in the event of default was to seek foreclosure of the mortgage"); *Saviano v. C.I.R.,* 765 F.2d 643, 645 (7th Cir.1985) (contract providing that money was lent to appellant on a nonrecourse basis means that appellee was not personally liable for its repayment); *In Re Dan Hixson Chevrolet Co.,* 20 B.R. 108 (Bankr.N.D.Tex.1982) ("nonrecourse simply means that the lienor may look only to the proper[t]y subject to his lien to satisfy his debt and cannot look to the debtor personally for payment").[8]

Thus, in its common usage, exemplified both by the legal dictionary and the language of the courts, "nonrecourse" does *not* mean that the purchaser cannot pursue the seller in the event that the seller has other contractual or common law obligations which have been breached. This Court holds, therefore, that the nonrecourse language in Section 12 upon which Defendant relies applies only to *the underlying indebtedness,* not to the contractual and legal obligations regarding the servicing and collection of the loan specifically expressed in the Agreement.

Given this holding, Plaintiff's claims are not automatically barred by the nonrecourse language in the Agreement. The contractual claims are not barred if they have basis in any assertion of breach of the terms of the Agreement *other than* any claimed obligation to repay all or any part of the underlying

---

**8.** Although the Court is told that unpublished opinions lack precedential value, *Bachelder v. Communications Satellite Corp.,* 837 F.2d 519, 523 n. 5 (1st Cir.1988), it is aware of *Regency Oldsmobile, Inc. v. General Motors Corporation,* No. 87–314(AMW), 1988 WL 36336 at *5, 1988 U.S.Dist. LEXIS 3505 at *15–16 (D.N.J. Apr. 18, 1988) ("By definition, [nonrecourse] refers to that type of secured transaction wherein a failure of repayment is resolved *inter se* the debtor and the creditor without regard to the source that initiated the relationship") which supports the position advanced herein and which, except for the inexplicable appellate fiat that strips it of its force, the Court would find most persuasive.

loan obligation *of the Borrower.* Thus, the Court must examine each of the six claims under the Fed.R.Civ.P. 12(c) standard for judgment on the pleadings.

## II. ANALYSIS OF THE COMMON LAW CLAIMS

### COUNT I—BREACH OF CONTRACT

Plaintiff bases its breach of contract claim on the assertion that many of Defendant's actions as enumerated herein are directly contrary to its obligations to Plaintiff under the Agreement. Under the Restatement (Second) of Contracts § 235 (1981):

> When performance of a duty under a contract is due, any non-performance is a breach.

The Agreement lays out various obligations between the parties, including, *inter alia:* PHSB's entitlement to 80% of any repayments received; Recoll's obligation to notify PHSB promptly of any material change in the financial condition of the borrower or the value of the collateral securing the loan; and Recoll's obligation to provide PHSB with the most complete and current credit related and other information regarding the borrower, the loan, or the security collateral.[9] Taking Plaintiff's assertions in the Complaint as true, and given the language in the Agreement signed by Defendant's predecessor in interest, Plaintiff may be entitled to relief for breach of contract for not giving PHSB 80% of any payments received and/or for failing to notify PHSB of material changes regarding the status of the loan, the borrower, or the collateral, obligations wholly independent of any obligation to repay the underlying loan. Thus, Defendant's motion is denied as to Count I.

### COUNT II—NEGLIGENCE

In Count II of the Complaint, Plaintiff alleges that Recoll's conduct, as outlined above, constitutes negligence in breach of Recoll's duty to PHSB under the Agreement which has caused substantial damage to PHSB. Under Maine law, "actionable negligence" exists only when the party whose negligence occasions the loss owes a duty, arising from contract or otherwise, to the person sustaining the loss. *Foley v. H.F. Farnham Co.,* 135 Me. 29, 188 A. 708 (1936).

Given the plain language of the Agreement, Defendant owes certain contractual duties to PHSB as a matter of law. *See, supra,* footnote 9. This Court is convinced that Plaintiff has alleged sufficient facts such that, if true, a negligence claim resulting from breach of a duty established in the Agreement, independent of any commitment to repay the underlying loan, has been stated. The motion will be denied as to Count II.

---

9. Section 9(B) of the Agreement provides in part:

 The Originating Bank after receipt and collection of any and other repayments and other sums which may be paid or received on account of the Loan ... shall remit to Participant its respective share thereof. As its share, Participant shall receive on its participation, pursuant to Section 4(A) hereof, eighty cents ($.80) of each dollar of all such repayments and Originating Bank twenty cents ($.20) of each dollar of all such repayments until Participant's participation in the Loan has been paid in full, and thereafter Originating Bank shall be entitled to retain all repayments until it has been paid in full ...

 Section 8(B) of the Agreement, entitled "Additional Obligations of Originating Bank," states:

 The Originating Bank agrees to provide the Participant regularly with the most complete and current credit related and other information concerning the Borrower, the Loan and the collateral securing the Loan that is available to the Originating Bank, including without limitation, copies of:

 1) all Originating Bank's monthly inspection reports pertaining to the Construction Project, including any such reports by architects and engineers which are received or obtained by Originating Bank;
 2) current financial statements of the Borrower, as well as of all co-makers, guarantors and sureties under the Loan;
 3) any officer's certificates, financial and other statements and information submitted by the Borrowers to the Originating Bank in connection with the Loan;
 4) the records of the Originating Bank reflecting the amounts and dates of receipt of principal and interest payments under the Loan;
 5) any new information that comes into the possession of the Originating Bank relating to any material change in the existence, value or lien status of collateral securing the Loan;
 6) any documentation in possession of the Originating Bank bearing upon the continuing creditworthiness of the Borrower, any co-makers, guarantors or sureties under the Loan.

## COUNT III—FAILURE TO ACT IN A COMMERCIALLY REASONABLE MANNER

■ In Count III, Plaintiff alleges that Defendant's actions constitute a failure to act in a commercially reasonable manner. Section 11(B) of the Agreement includes an express covenant of commercial reasonableness in case of default. Such covenant essentially requires that, in case of default, Recoll should take action that it deems "commercially reasonable" to pursue collection of the loan, to accelerate the indebtedness secured by the loan documents, to enforce the security of the loan, and/or to exercise any and all rights and remedies under the loan documents.[10]

In the Agreement, as in Section 9–504(3) of the Maine Commercial Code, only *post*-default conduct is subject to the commercial reasonableness requirement.[11] *See* 11 M.R.S.A. § 9–504(3). *Black's Law Dictionary* 376 (5th ed. 1979) defines "default" as "the omission or failure to perform a legal or contractual duty." While "default" is not specifically defined in the Agreement, Section 11(A) provides in part that, in case of default, Recoll and PHSB should "consult as to a mutually agreed upon course of action to pursue in order to collect the amounts then owed under the Loan." This language, and the context in which it is used, imply that by "default" the parties meant default *by the Borrower* on the underlying loan payments, as opposed to the failure by either Recoll or PHSB to perform a legal duty.

Nowhere in the pleadings does Plaintiff allege that Borrower has defaulted on the underlying note. This Court therefore holds that Plaintiff has failed to state a claim for failure to act in a commercially reasonable manner because such a duty only arises under the Agreement in the context of default, which has not been alleged herein. Thus, Defendant's motion will be granted as to Count III, subject to Plaintiff's amendment of the Complaint before March 9, 1993, pursuant to the obligation of Fed.R.Civ.P. 11, to allege that the Borrower is in default on the underlying note.

## COUNT IV—BREACH OF COVENANT OF GOOD FAITH

■ In Count IV, Plaintiff alleges that in failing to perform as stated in the Agreement, Defendant breached an implied covenant that Defendant would use good faith in performing its contract obligations under the Agreement. Whether such an implied covenant exists under Maine law has been the subject of much confusion in the jurisprudence of this Court and that of the Court of Appeals for the First Circuit. Recent developments make this an appropriate time for this Court to attempt to clarify the present status of Maine law on the question of whether a party to a contract is, *in all cases,* subject to an implied covenant that the party will exercise good faith in performing contractual obligations.

The issue first surfaced discretely in this district during this Court's handling of the pretrial motion practice in *Reid v. Key Bank of Southern Maine, Inc.,* Civ. No. 85–0088–P (Memorandum and Order on Defendant's Motion to Dismiss (D.Me. Jan. 7, 1986) (un-

---

**10.** Section 11 of the Agreement, entitled "Default," provides in full:

(A) [Recoll] shall promptly, after having knowledge thereof, inform [PHSB] of any event of default under the Note, Construction Loan Agreement or other Loan Documents. [Recoll] and [PHSB] shall then consult as to a mutually agreed upon course of action to pursue in order to collect the amounts then owed under the Loan.

(B) If [PHSB] and [Recoll] cannot mutually agree upon what course of action to take, [Recoll] *shall take such action as it deems commercially reasonable* in its judgment to pursue collection of the Loan, to accelerate the indebtedness evidenced and secured by the Loan Documents, to enforce the security for

the Loan, including the taking of possession or foreclosure, or both such actions, or to exercise any and all other rights or remedies under the Loan Documents in order to best protect and preserve the rights and interests of the parties hereto, but [Recoll] shall not have any obligation to take any course of action which in its judgment would result in a breach of [Recoll's] or [PHSB's] duty of dealing with Borrower in good faith or which would otherwise create a substantial risk or liability to [Recoll] or [PHSB]. (emphasis added).

**11.** The Court is aware that the Commercial Code is not applicable in this instance; however, it is useful to apply it by analogy.

published)). That motion addressed, *inter alia*, Count VIII of the Complaint which alleged a claim based on breach of the defendant's implied duty of good faith and fair dealing in performing the obligations of its loan agreement, note, and mortgage with its banking customer. The motion sought dismissal of the count on the basis that no such implied covenant existed under Maine law. In addressing the issue, this Court stated:

> A majority of the states, as well as the Restatement (Second) of Contracts (§ 205) and the Uniform Commercial Code (§ 1–203) recognize as a general principle of contract law that the parties to a contract must perform their duties thereunder in good faith. Burton, *Breach o[f] Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369 (1980). However, there appear to be no Maine cases either adopting or rejecting this principle. However, there is little, if any, reason to believe that the Maine Law Court would not follow, in an appropriate case, the majority rule. That rule involves no exotic proposition and has the persuasive benefit of adoption by the Restatement *and the Uniform Commercial Code.*

*Id.* at 5 (unnumbered) (emphasis added). The issue continued to be hotly disputed throughout the trial in the *Reid* case, and Count VIII was ultimately submitted to the jury on an ambiguous basis.[12]

The *Reid* case went to the Court of Appeals for the First Circuit and that court reviewed and affirmed this Court's handling of the issue involving Count VIII. In so doing, the Court of Appeals said:

> The district court took as self-evident the proposition that Maine contract law required good faith performance. *See generally* Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369 (1980). The Uniform Commercial Code, as adopted by Maine, states: 'Every contract or duty within this Title imposes an obligation of good faith in its performance or enforce-

ment.' 4 Me.Rev.Stat.Ann. tit. 11, § 1–203 (1964). That this obligation carries with it a cause of action seems clear from another provision of the Code: 'Any right or obligation declared by this Title is enforceable by action unless the provision declaring it specifies a different and limited effect.' *Id.* at § 1–106(2). *See also* Restatement (Second) of Contracts § 205 (1979).

> We interpret the Maine cases making reference to the general duty of good faith in light of this general acceptance of the principle. The Maine Supreme Judicial Court has explicitly recognized the U.C.C.'s 'broad requirements of good faith, commercial reasonableness and fair dealing.' *Schiavi Mobile Homes, Inc. v. Gironda*, 463 A.2d 722, 724–25 (Me.1983) (citing U.C.C. §§ 1–203, 2–103 & 1–106, Comment 1). In addition, some aspects of the present case concern the handling of Reid's bank accounts with Depositors and *would thus be governed by the standard of 'good faith' and 'ordinary care' under section 4–103 of the U.C.C. See C–K Enterprises, Inc. v. Depositors Trust Co.*, 438 A.2d 262, 265 (Me.1981).

. . . . .

> We view the Maine court as implicitly recognizing that contractual relationships *of the present nature* are governed by a requirement of good faith performance. We do not think that this duty to perform in good faith is altered merely by calling the contractual relationship 'adversary.'

*Reid*, 821 F.2d at 12–13 (emphasis added). In considering whether a cause of action arose from breach of such an implied covenant, the court said.

> First, a determination that no such cause of action exists would conflict with the clear meaning of section 1–203 of the U.C.C., particularly when read in conjunction with section 1–106(2). We assume that the Maine courts would adhere to the plain language of these provisions, *as well*

---

**12.** The Court has recently reviewed the trial transcript in *Reid*. Such transcript reflects that, in both ruling on Defendant's motions for directed verdict at trial and in its instructions to the jury, the Court articulated to the jury a bipartite basis

for the submission of the implied duty of good faith issue based upon: (1) the applicability of § 1–203 of the Maine U.C.C. to the obligations in question; and (2) the duty that existed generally under the Maine common law of contracts.

*as to generally accepted modern contract principles.*

*Id.* at 13 (emphasis added).[13]

While *Reid* was on appeal, this Court confronted the issue again in *United States v. H & S Realty Co.,* 647 F.Supp. 1415, 1424–25 (D.Me.1986). There, the United States sued a guarantor for payment of the deficiency on a Small Business Administration deferred participation loan. The guarantor asserted a third-party claim against the lending bank, alleging, *inter alia,* breach *by the lending bank* of an implied covenant of good faith and fair dealing *as between the bank and its borrower,* in connection with the administration of the loan and the maintenance of and realization on the collateral. *Id.* at 1424. Aware that the Maine U.C.C. applied to the contract obligations in question, and drawing upon its *Reid* experience with the issue of the existence of such an implied covenant of good faith, the Court observed, perhaps overbroadly considering the applicability of the Maine U.C.C. in *Reid,:*

> There is some uncertainty as to the exact source and content of the good faith standard applicable to Key Bank and to the SBA. Turning first to Key Bank, its relationship to H & S Realty is governed by Maine law. Although the Maine Law Court has not ruled on the question, this Court has previously *assumed* that Maine law imposes a general duty of good faith on the parties to a contract. *See Reid v. Key Bank of Southern Maine, Inc.,* Civ. No. 85–0088–P, slip op. at 5 (D.Me. Jan. 7, 1986) (Carter, J.) [ (unpublished) ].

*Id.* at 1424 (emphasis added). The Court then went on to consider which of two standards of good faith applied under Maine law.

---

**13.** After the appellate decision in *Reid,* the case of *Ricci v. Key Bancshares of Maine, Inc.,* 662 F.Supp. 1132 (D.Me.1987) (Watson, J.), came before the Court on post-judgment motions. Judge Watson (sitting by designation in this district) had submitted the case to the jury on the basis of the learning he took from the appellate opinion in *Reid.* In ruling on the post-judgment motions, he stated:

> The Court instructed the jury, that an implied covenant of good faith and fair dealing applied to this contract under Maine law. The Court notes that the opinion of the First Circuit Court of Appeals in *Reid v. Key Bank of Southern*

Once again, before the appellate decision in *Reid* was announced, the Court confronted the good faith issue. In *Triple–A Baseball Club Associates v. Northeastern Baseball, Inc.,* 655 F.Supp. 513 (D.Me.1987), *the Maine U.C.C. was not applicable to the contract obligations in dispute.* The Court made this observation:

> Although the Maine Law Court has not confronted the question, this Court has previously assumed that Maine law imposes a general duty of good faith on the parties to a contract. *United States v. H & S Realty Co.,* 647 F.Supp. 1415, 1424 (D.Me.1986); *Reid v. Key Bank of Southern Maine, Inc.,* Civ. No. 85–0088–P, slip op. at 5 (D.Me. Jan. 7, 1986) [ (unpublished) ]. Although the Uniform Commercial Code does not govern this contract, its definition of good faith as 'honesty in fact' is relevant here.

*Id.* at 536, as a predicate for use of the U.C.C. definition of "good faith" to determine that there was in that case no breach of any duty of good faith.[14]

Chronologically there followed, on June 10, 1989, the decision of the Court of Appeals in the *Reid* case. That was followed in October by the Court of Appeals' opinion on the appeal in *Triple–A Baseball Club Associates v. Northeastern Baseball, Inc.,* 832 F.2d 214, 219 (1st Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988), where the Court observed once again:

> The district court first ruled that Maine Law 'imposes a general duty of good faith on the parties to a contract.' 655 F.Supp. at 536. We think that was correct. *See*

---

*Maine, Inc.,* [821 F.2d 9] Civ.Ct. 86–1820 slip op. (1st Cir. June 10, 1987) issued subsequent to the Court's instruction of the jury in this case holds that a covenant of good faith and fair dealing *is implied in every contract under Maine law.*

*Id.* at 1141 (emphasis added).

**14.** The Court there noted that its decision on the existence of a good-faith duty was before the Court of Appeals in *Reid* and observed that the resolution of the issue on that appeal would not affect the result in the case then before the Court. *Triple–A Baseball,* 655 F.Supp. at 536, n. 13.

*Reid v. Key Bank of Southern Maine, Inc.,* 821 F.2d 9, 12–15 (1st Cir.1987).

*Id.*[15]

A number of conclusions are now readily apparent from the foregoing discussion of authorities:

(1) The courts of the State of Maine, and especially the Maine Law Court, have not decided that entry into a contract imposes upon the parties thereto a general, implied duty to carry out contractual duties with good faith and fair dealing.[16]

(2) Various provisions of the Maine U.C.C. impose such an implied duty in cases where the Code provisions apply to the contract obligations in question. *See* 11 M.R.S.A. §§ 1–203 and 4–103.

(3) The Restatement (Second) of Contracts (1979), § 205, recognizes the general applicability of such an implied duty.

(4) This Court in *Reid:*

(a) *held* that an implied duty of good faith existed there because of the applicability of the provisions of the Maine U.C.C. to the contract obligations at issue, and

(b) *predicted* that Maine law would recognize generally an implied duty in all contractual situations.

(5) This Court transmuted its "prediction" in *Reid* into an "assumption" of the existence under Maine law of such an implied duty in *H & S Realty, id.* at 1424, and *Triple–A Baseball, id.* at 536.

(6) The Court of Appeals in *Reid* affirmed the existence of a *general* duty of good

faith, *id.* at 12, but predicated its conclusion in that respect on the Law Court's explicit recognition of the "U.C.C.'s 'broad requirements of good faith, commercial reasonableness and fair dealing.'" *Id.,* and

(7) The Court of Appeals in *Triple–A Baseball* upheld what it construed as this Court's ruling that "Maine [l]aw 'imposes a general duty of good faith on the parties to a contract.'" *Id.* at 219.

The state of Maine law, without more, is that the *federal courts* of this district and circuit have, in the absence of any authoritative guidance or holding from the Maine courts, determined that Maine law imposes an implied general duty of good faith on the parties to a contract in carrying out their respective contractual obligations. There was a clear basis for the conclusion that the implied duty existed where the contractual obligations at the time were governed by the provisions of the Maine U.C.C. that imposed such a duty. *Reid* and *Ricci* were properly decided on that basis. There was originally a sufficient basis for the Court to predict in *Reid,* and to assume in the *Ricci, H & S Realty, Triple–A Baseball, Werman,* and *Reed Paper Co.* cases, that, given the opportunity, the Maine Law Court would recognize the existence of such an implied duty as a matter of general applicability. Such was, and is, the majority rule, and that rule is supported, if not based upon, the adoption of such a duty by both the Uniform Commercial Code and the Restatement (Second) of Contracts § 205 (1979).

---

**15.** Since *Triple–A Baseball,* the Court has indulged its prediction of a general implied duty of good faith performance in *Reed Paper Co. v. Procter & Gamble Distributing Co.,* 807 F.Supp. 840, at 847–48 (D.Me.1992). In the case of *Werman v. Malone,* 750 F.Supp. 21, 24 (D.Me.1990), the Court restricted the existence of the duty to circumstances involving contractual duties created by the U.C.C. and casualty insurance policies.

**16.** A case sometimes cited as authority for the proposition that the general duty of good faith in respect to performance of contract obligations exists under Maine law is the antique case of *Savage v. Whitaker,* 15 Me. 24 (1838). A careful reading of that case, however, does not support that conclusion.

The Court there states that "[a]n engagement to do a certain thing, involves an undertaking to secure and use effectually all of the means, necessary to accomplish the object; and among these, the most important and essential was, to obtain the written consent of the Postmaster General." *Id.* at 26. This Court is satisfied that that language is intended to relate to a description of an event that formed a part of the consideration for the note, as the court points out in the opinion. The court is not there discussing any implied duty not set forth in the contract but is referring to a portion of the express consideration for the contract formation.

The ineluctable fact is that in view of very recent Maine case law, the prediction has proven to be incorrect. The Maine Law Court has recently observed:

Defendant also contends that the Bank breached an implied covenant of good faith in not disclosing information that the Shawmut Inn project was failing when the Bank made loans to him. We have recognized that the Uniform Commercial Code, § 1–203, imposes a duty of good faith and fair dealing by banks, requiring 'honesty in fact in the conduct or transaction concerned.' *Diversified Foods, Inc. v. First Nat'l Bank* [of Boston] 605 A.2d [609] at 613 [ (Me 1992) ] (citing 11 M.R.S.A. §§ 1–203 (1964), 1–201(19) (1964)). The U.C.C. imposes a duty of objective good faith in certain situations. *See* 11 M.R.S.A. §§ 1–203 (1964), 3–406 (1964), 3–419(3) (1964), and 9–318(2) (Supp.1991). *We, however, have not extended that duty beyond its statutory scope. Diversified Foods, Inc. v. First Nat'l Bank of Boston,* 605 A.2d at 613–14.

*First NH Banks Granite State v. Scarborough,* 615 A.2d 248, 250–51 (1992) (emphasis added) (footnote omitted). In the *Diversified Foods* case cited by the court, there was in controversy the obligations *inter se* of banks and their borrowing customers. The court there gave clear expression to its reluctance to extend the U.C.C. provisions in respect to an implied duty of good faith beyond the scope of its application specifically expressed in the Code. The court said:

The Borrowers contend that, even if the Banks did not violate the terms of the Loan Agreement as allegedly modified by their course of dealing, they breached an implied duty of good faith. The Superior Court correctly concluded that the Uniform Commercial Code, § 1–203, imposed such a duty of good faith upon the Banks, requiring 'honesty in fact in the conduct or transaction concerned.' 11 M.R.S.A. §§ 1–203, 1–201(19) (1964); *see Reid v. Key Bank of Southern Maine, Inc.,* 821 F.2d 9,

14–15 (1st Cir.1987). The Borrowers contend that the Banks were also subject to an objective 'good faith' duty to act in a commercially reasonable manner.

The U.C.C. does impose the more onerous duty of objective good faith in certain situations. *See* §§ 2–103, 3–406, 3–419(3) and 9–318(2). The Borrowers contend that Article 4 extends such a duty to all bank activities. Article 4 does incorporate notions of 'ordinary care,' but is limited to issues of bank deposits and collections. The Borrowers allege no violations of the Banks' deposit and collection duties. *We decline to extend the duty beyond its statutory scope.*

*Diversified Foods, Inc. v. First National Bank,* 605 A.2d 609, at 613 (Me.1992) (emphasis added).

These two recent precedents establish, in the view of this Court, that there is no general implied duty of good faith under Maine law that operates beyond the scope of the mandate of the Maine U.C.C.[17] *Diversified Foods* so holds, and *First NH Banks* reflects that the Maine Law Court intends, at least for the nonce, not to create such an implied duty and to recognize only that duty created by the legislature in the Maine U.C.C. and not to extend it beyond the scope it is given in the express terms of the Code.

The practice of federal courts predicting the content of state substantive law where it is shrouded in doubt is always a risky, if sometimes necessary, venture. It is now clear that this Court's "prediction" cum "assumption" that Maine law would recognize such an implied duty was off the mark and should be promptly corrected. Accordingly, this Court will no longer recognize, in the absence of a clear holding to the contrary by the Maine Law Court, in its future application of Maine substantive law, existence of any implied duty to perform contractual obligations in good faith and with fair dealing outside of the context of the express terms of the Maine U.C.C. and contractual obligations

---

**17.** The Court notes the very limited exception carved out by the Law Court in *Linscott v. State Farm Mutual Auto Insurance Co.,* 368 A.2d 1161 (Me.1977). Noting that "a 'duty of good faith and fair dealing' in the handling of claims runs only [from an insurance company to its] insured," the Law Court refused to extend such a duty of good faith to a third-party tort claimant. *Id.* at 1163.

on a contract of casualty insurance when put in issue between the insured and the insurer.

There being no legal foundation for the claim asserted in Count IV of the Complaint herein, the *Motion to Dismiss* will be granted as to Count IV of the Complaint.

## COUNT V—BREACH OF FIDUCIARY DUTY

In Count V, Plaintiff alleges that in failing to perform as stated in the Agreement, Defendant breached its fiduciary duty to Plaintiff, causing substantial financial harm. Under Maine law, "fiduciary" and "confidential" relations are legal equivalents. *See Ruebsamen v. Maddocks*, 340 A.2d 31, 36 (Me.1975). "The facts constituting the alleged [fiduciary] relationship must be set forth with sufficient particularity" for an accurate determination of the matter. *Id.* at 35. The important elements of such a relation have been defined as "the actual placing of trust or confidence in fact by one party in another and a great disparity of position and influence between the parties to the relation." *Id.* In such a relationship, the "superior" party owes a fiduciary duty to the other party. *Diversified Foods*, 605 A.2d 609, 614–615.

Although the enunciated test would seem to have been crafted for an analysis of the relationship between two individuals, the same test has been applied by Maine courts in professional contexts as well. In two recent banking cases previously discussed, *Reid v. Key Bank of Southern Maine, Inc.*, 821 F.2d 9 (1st Cir.1987) and *Diversified Foods, Inc. v. First Nat. Bank of Boston*, 605 A.2d 609 (Me.1992), the courts applied the *Ruebsamen* test to relationships between banks and their borrowers and found, in each case, that there was insufficient evidence to establish a fiduciary relationship between the parties.

In *Reid* in particular, the First Circuit Court of Appeals examined the legal landscape on the issue of whether, and in what circumstances, a confidential or fiduciary relation may be implied between a bank and its depositors or loan customers. *Id.* at 17. Although the Court wrote that "statements in Maine cases suggest that the Maine courts

... might agree with the majority view that [fiduciary] relations cannot be excluded per se from the context of banks and their depositors or loan customers," the Court went on to affirm the lower court's ruling that the evidence presented was insufficient to prove a fiduciary relationship. *Id.* In its analysis, the Court looked for "any concrete facts alleged to show a relationship going beyond the ordinary bank/customer situation." *Id.* Next, the Court examined the evidence in light of the *Ruebsamen* test.

In the case at bar, Plaintiff has failed to allege any specific facts which show that the relationship between Plaintiff and Defendant went beyond the ordinary originating bank/participant situation. Under the "trust and confidence" prong of the *Ruebsamen* test, because the focus of the Agreement between the parties is that Recoll will properly perform certain duties regarding servicing and collecting on the loan, Plaintiff invested trust and confidence in Defendant.

The "disparity of position" prong is more difficult to assess. Reading the pleadings in the light most favorable to Plaintiff, this Court finds such pleadings devoid of any facts indicating "diminished emotional or physical capacity or of the 'letting down of all guards and bars' " that is implied by the use of the term "disparity of position" in the context of confidential relations in Maine. *Reid*, 821 F.2d at 18 (citing *Ruebsamen*, 340 A.2d at 35).

Therefore, no claim for breach of fiduciary duty has been stated in the pleadings, because, as a matter of law, no fiduciary relationship can be established from the facts pleaded. Thus, Defendant's motion will be granted as to Count V, subject to Plaintiff's amendment of the Complaint before March 9, 1993, pursuant to the obligation of Fed. R.Civ.P. 11, to allege particular facts establishing that a fiduciary relationship existed between the parties.

## COUNT VI—ACCOUNTING

In Count VI, Plaintiff alleges that, by virtue of Defendant's actions, Plaintiff is entitled to an accounting as to all monies received, advanced, or expended by

Defendant in connection with the Diamond Cove loan. In a diversity case, if state law governs the underlying substantive rights, state law defines the availability of equitable remedies, including an accounting. 19 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4513 & n. 71 (1982). Under Maine law, a court may order an accounting "where there is not a plain, adequate and complete remedy at law." *Paris Utility Dist. v. A.C. Lawrence Leather Co.,* 665 F.Supp. 944, 961 (D.Me.1987) (quoting *Graffam v. Wray,* 437 A.2d 627, 635 n. 12 (Me.1981)).

 In order to succeed in receiving an accounting, the moving party must allege: a breach of any contractual or other duty by Recoll; that as a result of such breach, Recoll has PHSB's money in its possession; and that PHSB has no adequate remedy at law. *Id.* at 961–962. PHSB has failed to plead that it has no adequate remedy at law. Therefore, Defendant's motion will be granted as to Count VI, subject to Plaintiff's amendment of the Complaint before March 9, 1993, pursuant to the obligation of Fed. R.Civ.P. 11, to allege particular facts establishing that Plaintiff has no adequate remedy at law.

Accordingly, it is ORDERED that Defendant's Motion to Dismiss the Complaint be, and is hereby:

1) DENIED as to Counts I and II;

2) provisionally GRANTED, subject to timely amendment of the pleadings as provided for herein, as to Counts III, V, and VI; and

3) GRANTED as to Count IV of the Complaint.

It is hereby ORDERED that Count IV be, and it is hereby, DISMISSED.

So ORDERED.